**SCOTT E. BRADFORD**, OSB #062824
United States Attorney
District of Oregon
**WILLIAM M. McLAREN, OSB #143836**
William.McLaren@usdoj.gov
Assistant United States Attorney
405 East 8th Avenue, Suite 2400
Eugene, Oregon 97401
Telephone: (541) 465-6771
**RYAN CONNORS, NYB #4404901**
Ryan.Connors@usdoj.gov
Senior Trial Attorney
150 M Street, NE
Washington, DC 20002
Telephone: (202) 598-3826
Attorneys for the United States of America

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**EUGENE DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **6:26-cr-00297-MC** |
| **v.** | **UNITED STATES' SENTENCING MEMORANDUM** |
| **LINH LUU,** | |
| **Defendant.** | **Sentencing: October 23, 2026, at 11:00 a.m.** |

The United States, by and through its undersigned attorneys, respectfully submits this memorandum in advance of the sentencing hearing scheduled for October 23, 2026. For the reasons below, the government recommends the Court sentence the defendant to a low-end guidelines sentence of three years' probation, a $10,000 fine, and $100 special assessment.

/ / /

/ / /

## PROCEDURAL HISTORY

On August 12, 2026, the government filed an information charging the defendant with one count of the Lacey Act for her role aiding and abetting the international trafficking of protected wildlife to and from Oregon. The defendant is scheduled to plead guilty on October 23, 2026. The Court granted the parties' request to proceed with sentencing on the same day. Pursuant to the plea agreement reached in this case, the government agrees to recommend a sentence at the low-end of the guidelines, and the parties jointly recommend the Court issue a $10,000 fine.

## LEGAL AND REGULATORY BACKGROUND

As described in the information, there are several U.S. regulations and laws governing the import and export of wildlife. In sum, importers, exporters, and their agents must declare and receive clearance for any wildlife items from U.S. Fish and Wildlife Service (USFWS) or customs authorities, present the wildlife and relevant permits for inspection, and accurately mark the contents of any package containing wildlife. *See* 50 C.F.R. 14, Doc. 1 at 7.

Further, the Convention on International Trade in Endangered Species of Wild Flora and Fauna (CITES) is a treaty signed by the United States, Socialist Republic of Vietnam (Vietnam), United Republic of Tanzania (Tanzania), and 182 other governments to protect fish, wildlife, and plants, that are, or may become, threatened with extinction. The United States implemented CITES through the Endangered Species Act (ESA) and made it unlawful to engage in the trade of listed species contrary to CITES. 16 U.S.C. §§ 1531 et seq, 1538(c)(1), Doc 1. at 3. Under CITES, species are protected according to a classification system including Appendices I and II. Appendix I consists of species threatened with extinction which are or may be affected by trade. Appendix II of CITES consists of species that are not presently threatened with extinction but

could become threatened if trade in the species is not regulated. Doc 1 at 2. Prior to import into the United States, any shipment containing CITES Appendix I wildlife is required to have a permit issued by the USFWS. All shipments of CITES Appendix I or II wildlife are required to have export permits from the country of exportation. 50 C.F.R. 23.20, Doc. 1 at 4.

In addition to implementing CITES, the ESA prohibits the import, delivery, receipt, carriage, transportation, and shipment, in foreign commerce and in the course of commercial activity, of any listed endangered species, and it prohibits the violation of any regulations pertaining to either listed endangered or threatened species. 16 U.S.C.§§ 1538(a)(1)(A), (a)(1)(E), and (a)(1)(G), Doc. 1 at 5.

## FACTUAL BACKGROUND

The facts are accurately set forth in the Presentence Investigation Report ("PSR"), and the parties stipulated to the offense conduct in the plea agreement.

### A. Government's Investigation Into Wildlife Trafficking between the United States and Vietnam

In 2019 the USFWS identified Person #1, an individual who served as the leader of a trafficking ring based out of Hanoi, Vietnam. Person #1 arranged for the illegal shipments of black bear gallbladders and cougar bones into Vietnam and facilitated the smuggling of rhinoceros horns, lion teeth, and tiger pelts into Oregon. Person #1 and their accomplices did not declare any of the wildlife or obtain any of the necessary permits.

Person #1 ultimately agreed to buy and sell wildlife with several individuals including one, who unbeknownst to them was an undercover USFWS agent. Person #1 arranged for the agent to send and receive money from defendant Luu, who Person #1 stated they knew from Vietnam but currently resided in California. Luu and her husband, separately charged defendant

Kevin Le, proceeded to process the payments for some of the transactions of illegally imported and exported wildlife.

**B. Defendant's Involvement in the Overseas Trafficking**

Defendants Le and Luu facilitated the financial transactions for about half of Person #1's illegal wildlife shipments. They received money from U.S. buyers and sent funds to U.S. sellers who were doing business with Person #1. Person #1 described these shipments as building trust and testing customs so they could later handle multi-million-dollar wildlife deals. Person #1 told the agent there was an extra fee to move the money through defendants Le and Luu. They handled the payments for approximately $51,100 in wildlife that were processed through their checking and PayPal accounts.

**C. Summary of Individual Wildlife Trafficking Transactions**

In September and October 2019, defendant Luu facilitated $225 in payments between the undercover agent and Person #1 for the export of five black bear gallbladders from Oregon to Vietnam. One year later, in September 2020, she accepted a $1,435 payment for the export of four lion teeth from Tanzania that Person #1 had arranged.



*(lion teeth shipped to Oregon)*

In December 2020, the undercover agent and Person #1 negotiated the import of rhinoceros horns from Vietnam. Person #1 stated they had obtained the horns from South Africa. The total agreed price for two pieces of horn was $21,801 with a $12,000 cash down payment that would be hand transferred to defendants Le and Luu in Garden Grove, California. Defendant Luu and the undercover agent finalized the details over the phone on how to transfer the money.

On December 18, 2020, the agent met defendants Le and Luu in the parking lot of a Target store. During the investigation, the agent learned that defendant Luu had worked in the financial services industry and that defendant Le was familiar with U.S. bank reporting requirements. The agent gave the defendants the $12,000 in cash, which defendant Luu counted. During the meeting, defendant Luu stated that Person #1 was her friend and defendant Le stated they are from the same town and know each other's families. Defendant Le warned that while it is more convenient to move money through banks, it leaves traceability and it was important to build trust by doing business in person. Defendant Luu discussed U.S. banking rules involving transactions over $10,000.

The agent discussed how the cash came from illegal wildlife trafficking and that Person #1 would ship rhino horn in the mail. Defendant Le stated that defendant Luu was the only individual Person #1 trusted in the United States. Defendant Le also stated that if this deal went well, they would go ahead with future transactions and avoid traceability.

Between December 29, 2020, and January 25, 2021, defendant Luu, Person #1, and the agent exchanged WhatsApp messages about wire transferring the remaining balance and concerns with government tracking of large transfers. As instructed, the agent made one wire transfer of $4,900 to defendant Le's account and one wire transfer of $4,901 in defendant Luu's account. The rhino horn arrived in Oregon disguised as a household decoration.



*(The rhino horn as it arrived and after being uncovered)*

In February 2021, the agent, Person #1, and defendant Luu planned the sale and exportation of cougar bones from Oregon to Vietnam. On February 27, defendant Luu sent a PayPal transfer to the agent for $400.

On March 9, 2021, the agent and defendant Luu had a WhatsApp video call where they discussed payment of approximately $8,100 for a rhinoceros horn purchase and $4,000 for a tiger pelt purchase. In this conversation she gave similar instructions to those of prior purchases where the payment would be split between her and defendant Le's accounts. On March 12, 2021, the agent made two wire transfers for $4,195 to defendants Le and Luu respectively to cover the purchase price of the rhinoceros horn. On March 30, 2021, another wire transfer was made to defendant Luu's account for $4,000 to cover the purchase of the tiger pelt. A third payment through PayPal for $274 was made to defendant Luu as a monetary transfer fee for a separate rhinoceros horn that was exported from Vietnam to Oregon by Person #1.

\\\

\\\




*(photo of tiger pelt shipped to Oregon)*

## THE SENTENCING GUIDELINES CALCULATION

The maximum penalty for the Lacey Act is five years imprisonment, a fine of $250,000 (or twice the financial gain or loss), and a three-year term of supervised release. The government concurs with the Sentencing Guidelines calculation set forth in the PSR, which is the same as the guidelines stipulated in the plea agreement and includes the government's request for a downward variance based on the defendant's early willingness to accept responsibility:

| Guidelines | Amount |
|---|---|
| Base Offense Level USSG §2Q2.1(a) | 6 |
| Pecuniary Gain USSG § 2Q2.1(b)(1) | +2 |
| Market Value of Wildlife USSG § 2B1.1(b)(1) | +6 |
| Acceptance of Responsibility § 3E1.1(b) | -2 |
| Zero-Point Offender USSC § 4C1.1 | -2 |
| Early Resolution Variance 18 U.S.C. § 3553(a) | -3 |
| **Total Offense Level** | 7 |
| **Resulting Guideline Range** | **0-6 months** |

A total offense level of 7 and a Criminal History Category of I results in an advisory guideline range of zero to six months' imprisonment.

## DISCUSSION OF SENTENCING FACTORS

Section 3553(a) requires sentencing courts to consider several factors in imposing a sentence including: the nature and circumstances of the violation and the history and characteristics of the defendant; the need for the sentence to reflect the seriousness of the violation, promote respect for the law, and provide just punishment; the need for the sentence to adequately deter criminal conduct; the need to protect the public from further crimes of the defendant; and the need to provide the defendant with needed education, vocational training, medical care and/or other correctional treatment in the most effective manner. Sentencing courts must also consider the kinds of sentences available, the applicable Guidelines and pertinent policy statements, and the need to avoid unwarranted sentencing disparities.

### A. Nature and Circumstances of the Offense

The defendant enriched herself by essentially laundering payments to aid and abet wildlife trafficking sales in violation of federal law. Even though she did not kill protected wildlife herself, she fueled the illegal market for their parts by processing the money that connects black market buyers and sellers. In doing so, she became part of the underground wildlife trade, which is lucrative and rivals better-known criminal activities. In 2017 "[t]he illegal aspect of wildlife trade [was] estimated to be a $5-20 billion dollar industry, comparable to the international trade of narcotics and weapons."[1] It has only increased since then. "The wildlife trade generates $23 billion a year for transnational criminal organizations, according to

[1] "Summarizing US Wildlife Trade with an Eye Toward Assessing the Risk of Infectious Disease Introduction," K.M. Smith, et al., *EcoHealth* (2017). https://pmc.ncbi.nlm.nih.gov/articles/PMC5357285/ (Last visited Oct. 8, 2026).

[U.S. Homeland Security Investigations] … The agency ranks wildlife trafficking as the fourth-largest source of illicit revenue globally after drugs, human smuggling, and counterfeit goods."[2]

Protected Wildlife

The American black bear, *Ursus americanus*, is a large omnivore native to North America, including Oregon. The American black bear has been listed in Appendix II of CITES since 1992. Bear bile extracted from gallbladders has been used in traditional Chinese medicine for thousands of years, and in 2009 was valued at $30,000 to $50,000 per kilogram in Hong Kong.[3] As "Asian bear populations are diminishing, poachers and smugglers have turned to North America's currently stable American black bear population" as a source of gallbladders.[4]

Defendant Luu facilitated in the trafficking of some of the most iconic and endangered wildlife species, including lion teeth, rhinoceros horns, and a tiger pelt. Lions have been listed as threatened under the ESA and in CITES Appendix II since 2016. The white rhinoceros was listed as threatened in 2013 and in CITES Appendix I in 1977. The rarer black rhinoceros has been listed under the ESA as endangered since 1980. Tigers have been covered by CITES Appendix I and the ESA as endangered since 1975.

Each of the species involved in this trafficking scheme is crucial to their respective habitats. The protection of endangered and threatened species is essential to the preservation of biodiversity, ecological integrity, and the continued existence of species at risk of extinction. The unlawful trafficking of endangered species and their parts can further diminish vulnerable populations, disrupt natural ecosystems, and create irreversible damage to their ecosystems.

---

[2] "In Suriname, a shadowy hunt for traffickers selling jaguar parts to China," Nick Miroff & Carolyn Van Houten, *Washington Post* (Feb. 23, 2025). https://www.washingtonpost.com/world/2025/02/23/suriname-jaguar-trafficking-dhs-investigations/ (Last visited Oct. 8, 2026).
[3] "Bear bile: dilemma of traditional medicine use and animal protection," Y. Feng, et al, *Journal of Ethnobiology and Ethnomedicine* (2009), https://pmc.ncbi.nlm.nih.gov/articles/PMC2630947/. (Last visited Oct. 8, 2026).
[4] "Throwing Caution to the Wind: The Global Bear Parts Trade," A. Roberts & N. Perry, Lewis & Clark Law School *Animal Law Review* Vol. 6, Issue 1 at 136 (2000).

Although wildlife trafficking may seem like a crime with limited impacts, the opposite is true. Wildlife, especially endangered species, can carry significant cultural, ecological, and economic value. Wildlife tourism has been described as a "key contributor" to socio-economic development for many African communities.[5] The animals involved here are long-lived creatures reaching upwards of 20 to 50 years. Their value to local communities and environments is present throughout their lives, but once killed, the only value lies in a one-time illicit sale. All the species involved in this case are endangered, threatened, and/or protected by international treaties, yet the defendant contributed to their further decline through her actions for personal financial gain.

Had the defendant or Person #1 applied for a CITES or import/export permit, USFWS would not have granted one. When the defendant ignored this requirement so she could profit, she deprived the scientific community of the data needed to know how often these species were traded and from where. "These details are crucial for management decisions, especially since CITES is designed to consider trade at both the individual species level and at broader taxonomic levels,"[6] such as tracking protected mammal populations.

Finally, the defendant's trafficking frustrated the regulatory scheme meant to protect and monitor these species. The declarations and permits are necessary so authorities can verify imports, track the movement of species, screen them for disease and pests, and ensure that they

---

[5] Roz Price, *The Contribution of Wildlife to the Economies of Sub Saharan Africa,* Institute for Development Studies (2017), https://wildlifeeconomy.info/sites/default/files/2017-TheContributionOfWildlifeToTheEconomiesofSubSaharanAfrica.pdf; Alessandra Rossi, *Uganda Wildlife Trafficking Assessment* (TRAFFIC Int'l 2018), https://www.traffic.org/site/assets/files/8460/uganda_wildlife_assessment.pdf (Last visited Oct. 13, 2026).

[6] "Analysis of 20 years of turtle exports from the US reveals mixed effects of CITES and a need for better monitory," Tara Easter & Neil Carter, *Conservation Science and Practice* (Jan. 16, 2024). https://doi.org/10.1111/csp2.13092 (Last visited Oct. 8, 2026).

are related to bona fide purposes such as research or public education. The totality of the nature and circumstances of the offense support the recommended sentence.

**B. History and Characteristics of the Defendant**

The defendant has no prior convictions and promptly agreed to plead guilty to an information. She did not file any pre-trial motions and thus saved the government litigation resources. The government therefore requests that the Court grant a three-level downward variance to the guideline range pursuant to 18 U.S.C. § 3553(a).

It is noteworthy that the defendant graduated from college in New York and has a legitimate career as a staff accountant. She chose to not rely on her lawfully earned salary and instead use her financial skills to help evade bank reporting requirements and possible detection by law enforcement. When she and her husband were told in a Target parking lot that they were receiving illegal cash so rhino horn could be mailed into the United States, she did not pause or waiver. She instead decided her personal profit was more important than the law or welfare of an endangered animal.

<u>Deterrence</u>

The Court's sentence should reflect the scope and seriousness of this offense, and the need to promote respect for the law. A low-end guideline sentence and $10,000 fine is sufficient, but not greater than necessary, to deter the defendant and general public who would seek to violate wildlife and import laws for personal gain or enjoyment. This includes deterring those who would exploit the banking and the mail systems to traffic in wildlife. General deterrence is achieved by establishing the perception—among those who might choose to profit by trafficking—that the chance of being apprehended is high and that the Courts will punish this conduct.

Further, the wildlife trafficking community is interconnected, and the consequences faced by the defendant will certainly be learned of by other potential traffickers. Similarly, the niche nature of the market means that the impact of such a deterrent effect on wildlife trafficking as a whole will be significant.

The jointly agreed upon fine recommendation of $10,000 would disgorge the defendant of illegal proceeds. Pursuant to 34 U.S.C. § 20101(b)(1)(A), any fine imposed by the Court should be paid by the clerk into the Cooperative Endangered Species Conservation Fund, which Congress established to aid in the investigation of Lacey Act and other conservation crimes. 18 U.S.C. § 3375(d).

Unwarranted Sentencing Disparity

This case is unique in that the defendant facilitated wildlife trafficking as the financial middleman. He did not directly buy or sell the wildlife or take the lion's share of profits. As a result, the government is not aware of directly applicable cases for the Court to consider in order to prevent sentencing disparity. Some recent Lacey Act cases involving the low-end of the guidelines have included:

A South Carolina man illegally imported approximately $38,000 in sperm whale teeth and bones, which he resold online. He forfeited the items and pleaded guilty to the Lacey Act. The court sentenced him to 30 days of home confinement and a $15,000 fine. *United States v. DeLoach*, 9:25-cr-164 (D.S.C. 2025). As part of that investigation, a Maine man pleaded guilty to selling approximately $9,500 in protected scrimshaw whale teeth, and protected bear and bird parts. He forfeited his inventory and was sentenced to one year of probation. *United States v. Bachkovsky*, 2:25-cr-128 (D.Me. 2025).

A New York man illegally exported 336 protected turtles to Hong Kong in the illegal pet trade. The turtles were valued on average at $55,000 in the domestic market and $550,000 abroad. He pleaded guilty to the Lacey Act for falsely labeling the exported packages to avoid detection. The court considered his young age, the impact of Covid, and his gainful employment since arrest in sentencing him to four years' probation and an $18,900 fine. *United States v. Milis*, 1:24-cr-232 (E.D.N.Y. 2024).

## CONCLUSION

For these reasons, the United States respectfully requests that the Court impose a low-end guideline sentence of three years' probation, a $10,000 fine to be paid by the clerk into the Cooperative Endangered Species Conservation Fund, and mandatory $100 special assessment.

Dated: October 14, 2026

Respectfully submitted,

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General

*/s/ Ryan Connors*
RYAN CONNORS
Senior Trial Attorney

SCOTT E. BRADFORD
United States Attorney

*/s/ William M. McLaren*
WILLIAM M. McLAREN
Assistant United States Attorney

*/s/ Michael A. Wilson*
MICHAEL A. WILSON
Law Clerk